OPINION
John M. Stephens is appealing his convictions for one count of rape, one count of kidnapping, and one count of intimidation of a crime victim. He is asserting five assignments of error for our review.
The Montgomery County Grand Jury indicted Stephens on February 23, 1999 for two counts of rape by force or threat of force, one count of kidnapping for the purpose of sexual activity, two counts of felonious assault with a deadly weapon, and one count of intimidation of a crime victim. All counts relate to Tracey Stephens, Stephens' ex-wife and to events which occurred on February 18, 1999. A two day jury trial commenced on May 2, 1999.
At trial, Tracey testified to the following version of events. Tracey and Stephens were married on March 19, 1988. The couple separated several times and eventually divorced, although the record does not indicate when the divorce occurred. On January 15, 1999, law enforcement officers filed domestic violence charges against Stephens as a result of an altercation with Tracey. Tracey was scheduled to testify about the incident before the grand jury on February 18, 1999. According to Tracey, Stephens had seen the paperwork scheduling her appearance before the grand jury, and he had been aware that she was scheduled to testify. Tracey stated that during the weeks preceding her scheduled testimony, Stephens "might have been" living in her trailer. On February 17, 1999, Stephens came to Tracey's trailer and would not leave. Tracey had previously arranged for Stephens to move in with a friend, but he refused to leave her trailer on that day.
During the course of the evening, Tracey called her boyfriend, John Estep. Estep knew that Stephens was at the trailer and had been causing some trouble. Tracey promised to "check in" with Estep on his 3 a.m. break at work, but she fell asleep on her couch. At approximately 5:30 a.m., Tracey awoke and told Stephens, who had fallen asleep on the floor of the trailer, to leave so she could get ready for her morning appointment. Stephens became angry, stating "You're gonna go to Court today, aren't you; and you're gonna testify against me today, aren't you." When Tracey admitted that she was going to testify before the grand jury, Stephens responded by pushing her and choking her with his hands and with an extension cord. While beating her, he threatened to kill her and stated that their kids "were not gonna have a mother." At some point Tracey lost consciousness. Upon regaining consciousness, Tracey had a black eye. Tracey stated that a few times during the altercation, Stephens had carried an open pocketknife in his hand, had held the knife up to Tracey's neck while warning her to be quiet, and had threatened to use the knife on her and to kill her.
When she regained consciousness, Stephens forced Tracey to go into the woods behind her trailer, despite her verbal protests. Once in the woods, Stephens told Tracey that he was going to remove her clothing regardless of her wishes. Stephens partially removed Tracey's clothing, held her down, moved on top of her, and penetrated her vagina with his penis. Tracey resisted and begged him to stop, but he continued and threatened to kill her if she was not quiet. At trial, Tracey could not remember if Stephens had tried to force her to have oral sex.
After the incident, Tracey was cold and shaking. Tracey and Stephens went back to the trailer where Tracey indicated that she needed to go to a pay phone to call an ambulance because she was hurting and thought she was going into shock. Tracey and Stephens left the trailer to go to a pay phone. On their way, Tracey persuaded Stephens to return to the trailer, and she proceeded to the pay phone alone. After Stephens began heading back to the trailer, Tracey ran to other trailers in search of help.
Tracey arrived at Mary Anderson's trailer at approximately 7:30 a.m. and asked to use her phone. Anderson took one look at Tracey's face and asked Tracey what had happened. Tracey immediately replied "My old man done it." According to Anderson, Tracey used her phone to call Estep, paced around her trailer, and left after a few minutes. After leaving Anderson's trailer, Tracey began walking and spotted Estep's van as it entered the trailer park. Estep had previously called 911 for assistance to check on Tracey. Upon encountering Estep, who was accompanied by Sergeant Greg Menke, Detective James M. Glaser, and Deputy Sheriff Jay Vitali, Tracey blurted out what had just happened. It was immediately apparent to the officers that Tracey had been beat up because she had a black eye, redness on her face and neck, dirt on her clothes, and that she was visibly upset. The officers immediately began looking for Stephens, and an ambulance was called to transport Tracey to Good Samaritan Hospital for treatment and evidence collection.
On cross-examination, Tracey admitted that she had used crack cocaine in the past, but stated that she had not used any for several weeks prior to this incident. Tracey denied stating to a passerby that the bruises on her face were from a fight with "Bonita," claiming that Stephens had fabricated that story because he was "not gonna go to prison for [her]."
Approximately one hour later, a member of Stephens' family informed Estep that Stephens was at the Frisch's restaurant two miles from the trailer park. The officers found Stephens behind a Hardee's dumpster next to Frisch's. Deputy Vitali immediately ordered Stephens to put his hands in the air and face the wall behind him, but Stephens was uncooperative. Knowing that Stephens could have a pocketknife, and noticing that Stephens' hands were concealed, Sgt. Menke pulled out his service revolver upon arriving at the scene. As Sgt. Menke put the revolver away, Stephens "came around to the right," and Deputy Vitali and Sgt. Menke saw a reflection on an object Stephens had in his hand. Deputy Vitali yelled "knife," backhanded Stephens, and a pocketknife thumped to the ground. Deputy Vitali tried to control Stephens by pinning him on the concrete, but Stephens resisted. Deputy Vitali pepper-sprayed Stephens, and Stephens finally bent his arms enough for the officers to handcuff him. Stephens was eventually brought under control and placed in the cruiser.
Stephens testified to a completely different series of events. According to Stephens, he and Tracey had smoked crack cocaine all afternoon on February 17, 1999. At approximately 9 p.m., Stephens gave Tracey twenty dollars and she walked with a friend in search of more crack. He stated that while looking for crack, Tracey was supposed to make arrangements for Stephens to move in with his friend. Stephens admitted that earlier that day, Tracey had asked him to leave the trailer.
According to Stephens, Tracey did not come home until 5:30 a.m. on February 18, 1999. Immediately Stephens noticed that Tracey had a black eye, which Tracey explained that she had received from a physical altercation with "Bonita" or "Belinda" over crack. Tracey asked Stephens to leave so she could get ready for an appointment. He believed her appointment was with the welfare department to find a home for her and her children. Although Tracey repeatedly asked him to leave, the two eventually fell asleep. Tracey awoke when a neighbor dropped by the trailer. Once the neighbor left, Tracey became very upset and began screaming. She spoke about having "no reason for life." Stephens grabbed a bottle of pills from Tracey and they held each other. He told her that he loved her and that they could make things work.
Stephens then asked if he could make love to her. Tracey "did not decline," despite the fact that she was menstruating, and the couple had vaginal intercourse on the living room floor. Afterwards, Tracey willingly accompanied Stephens on a walk in the woods. During this walk, Stephens mentioned that he wanted to contact his sister for help to overcome their crack addiction. Tracey again began screaming and headed back to the trailer. Stephens followed her, and the two walked back "hand in hand."
Back at the trailer, Tracey mentioned that she felt sick and that she wanted to call an ambulance. Stephens offered to walk to the pay phone to call the ambulance for her, but Tracey declined, stating "[Y]ou have that Domestic against you and I'd hate for them to think that something happened." Tracey kissed him goodbye and left for the phone, but she did not return. Later, Stephens left the trailer and saw a police officer enter the trailer park. He instantly had "bad feelings" when he saw the officer, so he left and went to Frisch's to call a relative for a ride home.
After eating at Frisch's, Stephens walked to the back of the parking lot and stood there, cleaning his fingernails with his pocketknife. According to Stephens, he was "just sittin' there doing nothin'" when two officers approached him, yelled at him to drop the knife, and then jumped him. He claims he was slammed to the ground repeatedly, but he did not resist.
Upon cross-examination, Stephens admitted that he knew domestic violence charges had been filed against him, and that he had seen the domestic violence papers in Tracey's trailer. He also admitted that after having intercourse with Tracey he had asked her to take a walk to a pay phone three miles from her trailer, instead of to the pay phone two small blocks from her trailer, "in case someone did hear her screaming and think that I was doing something to hurt her." Stephens admitted that he had heard Tracey make the comment to Anderson that her "old man done it." Furthermore, evidence technicians discovered a bloody towel in the woods, consistent with Tracey's story that Stephens had forced her to have sex in the woods. Stephens claimed that the towel was used to clean their crack pipe, and that it must have fallen from his pocket during their walk in the woods.
Stephens denied having the knife on his person while he was with Tracey, and he denied holding a knife to Tracey's throat. He also denied holding an extension cord around her neck, trying to choke her, hitting her in the face, and forcing her to have sexual intercourse.
Stephens' brother-in-law, Larry Rose, testified on Stephens' behalf. Rose testified that he and his wife, Stephens' sister, had temporary custody of Stephens' and Tracey's oldest daughter, Savannah, because of Tracey's and Stephens' cocaine problems. Twice in January of 1999, Rose went to Tracey's trailer to get presents and clothing for Savannah and both times Stephens had been in the trailer. Additionally, after the domestic violence incident on January 15, 1999, Rose had seen Stephens' car at the trailer park.
The State dismissed one count of rape for lack of evidence at the close of its case in chief. The jury returned guilty verdicts for the remaining rape, kidnapping, and intimidation charges. The jury returned verdicts of not guilty on the felonious assault charges.
The trial court sentenced Stephens to eight years incarceration for the rape charge, seven years for the kidnapping charge, and three years for the intimidation charge. The sentences for rape and kidnapping were to be served concurrently, however the trial court ordered the intimidation sentence to be served consecutively to the rape sentence. The trial court further determined that Stephens was a sexually-oriented offender, but not a sexual predator or a habitual sexual offender.
Stephens now timely appeals these convictions, asserting five assignments of error.
 I. The Appellant was denied his constitutionally guaranteed right of effective assistance of counsel.
Preliminarily, to show ineffective assistance of counsel, a defendant must prove that his trial attorney's representation fell below an objective standard of reasonableness and that the defendant was prejudiced by the deficient performance. Stricklandv. Washington (1984), 466 U.S. 668, 687-688; State v. Bradley
(1989), 42 Ohio St.3d 136, paragraphs two and three of the syllabus. In order to show prejudice, the defendant must prove a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. Strickland,supra, at 694. Therefore, to prevail, Stephens must show both prongs of the foregoing test.
Stephens argues that trial counsel was ineffective for failing to file a Crim.R. 14 motion requesting to sever the intimidation charge from the remaining charges. He contends that evidence of the intimidation charge led to the introduction of evidence of prior domestic violence acts which were "highly prejudicial" to Stephens and irrelevant to the rape and kidnapping charges. According to Stephens, the intimidation charge was of a "strong prejudicial nature" and his due process rights were violated by trying all charges together.
As we recently stated in State v. Owens (Feb. 25, 2000), Montgomery App. No. 17394, unreported,
 Under Crim.R. 8(A), joinder is permitted if offenses are of the same or similar character, are based upon the same act or transaction, or are based upon two or more acts or transactions connected together or part of a common scheme or course of criminal conduct. See, also, State v. Franklin
(1991), 62 Ohio St.3d 118. It has long been held that "joinder and the avoidance of multiple trials is favored for many reasons, among which are conserving time and expense, diminishing the inconvenience to witnesses and minimizing the possibility of incongruous results in successive trials before different juries." State v. Torres (1981), 66 Ohio St.2d 340, 343 [20 O. O.3d 313, 315], citing State v. Thomas (1980), 61 Ohio St.2d 223, 225.
 However, a defendant may file a Crim.R. 14 motion to sever if he can establish prejudice to his rights. A reviewing court may reverse a trial court's decision denying a motion to sever if an appellant affirmatively shows that (1) his rights were prejudiced, (2) at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) the trial court abused its discretion by refusing to separate the charges for trial. Torres, supra, at syllabus. Furthermore, in reviewing whether a defendant's rights would be prejudiced by the joinder of multiple offenses, a court must determine if evidence of the first offense would have been admissible at the trial of the second offense under Evid.R. 404(B), and, if not, whether "the evidence of each of the crimes joined at trial is simple and direct." Franklin, supra, at 122. See, also, State v. Hamblin (1988), 37 Ohio St.3d 153, 158-159; State v. McCleskey (Nov. 16, 1994), Montgomery App. No. 14351, unreported. It is believed that the jury is capable of segregating the proof on multiple offenses when the evidence as to each offense is uncomplicated and is sufficient to sustain a verdict on each charge. Franklin, supra, at 122.
In this case, the events which took place in Tracey's trailer and in the woods on February 18, 1999 could not be viewed in isolation without reference to the January domestic violence charges filed against Stephens. See, generally, State v. Knox
(Feb. 8, 1989), Montgomery App. No. 10590, unreported. The State's case was based upon Stephens' retaliation for Tracey going to testify before the grand jury regarding Stephens' domestic violence charges. According to Tracey, Stephens knew that she was scheduled to testify against him on the morning of February 18. He stayed the night, ignoring Tracey's protests. That morning, when she told him to leave so she could get ready for her "appointment," he became agitated and stated "You're gonna go to Court today, aren't you; and you're gonna testify against me today, aren't you." When she admitted that her appointment was with the grand jury, Stephens became violent, pushing her to the floor and choking her. Thereafter, Stephens led Tracey into the woods and forced her to have sex. Without evidence of the domestic violence incident and of Tracey's scheduled appearance before the grand jury, the State would not have been able to show what provoked Stephens to become so angry at Tracey.
Furthermore, we agree with the State that the jury's acquittal of Stephens on the felonious assault charge against Tracey indicated that the jury had been able to separate the evidence in this case with respect to the different charges and that the jury was not "swayed" by the evidence of Stephens' previous incidents of domestic violence. See State v. Chavis
(July 27, 1992), Butler App. No. CA91-10-171, unreported.
In light of the preceding analysis, it is not clear that the outcome of the trial would have been different had the intimidation charge been tried separately from the remaining charges. We cannot find that Stephens would have been able to make an affirmative demonstration that his right to a fair trial was prejudiced by the joinder. We must, therefore, find that counsel's performance, in failing to make a motion for relief from prejudicial joinder, was not deficient.
Stephens' first assignment of error is overruled.
 II. The Appellant was denied his constitutionally guaranteed right of due process as a result of prosecutorial misconduct.
During the State's questioning of May Withers, the emergency room nurse who had examined and completed the rape kit on Tracey, the prosecutor asked questions about Tracey's physical and emotional state. Stephens now cites the following portion of that questioning as evidence of prosecutorial misconduct:
 Q. Okay. Did you — in relaying — and again, I don't want you to tell us what she said, but — actually, I do want you to tell us what she said, but we can't.
 Without telling us what she said, can you just — can you tell us whether or not she — us . . . there were times or places where she was hesitant or embarrassed or it was difficult or . . . * * *.
(Tr. 141.) He argues that his conviction should be overturned because the prosecutor's question prejudicially inferred that the nurse had damaging evidence against Stephens which she could not communicate to the jury. For the reasons stated below, we do not agree that this question rose to the level of prosecutorial misconduct.
In considering claims of prosecutorial misconduct, we must examine whether the prosecutor's conduct at trial was improper and, if so, whether this conduct affected the defendant's substantial rights. State v. Lott (1990), 51 Ohio St.3d 160, 165. The analysis centers on the fairness of the trial, not the culpability of the prosecutor, in determining whether the conduct is grounds for error. State v. Apanovitch (1987), 33 Ohio St.3d 19,24. See, generally, State v. Maurer (1984), 15 Ohio St.3d 239,266. Error exists if it is clear beyond a reasonable doubt that the jury would not have found the accused guilty absent the prosecutor's comments. State v. Smith (1984), 14 Ohio St.3d 13,15; State v. Benge (1996), 75 Ohio St.3d 136, 141. Upon review, the questionable statements must be examined in the context of the record as a whole; harmless errors must be disregarded. UnitedStates v. Hastings (1983), 461 U.S. 499, 509. Additionally, the state is permitted wide latitude in commenting on and drawing inferences from the evidence. State v. Stephens (1970), 24 Ohio St.2d 76,82.
In this case, defense counsel did not object to the questionable language used by the prosecutor which Stephens now claims as error. As such, we must evaluate the remark under a plain error standard.
In viewing the record in this case as a whole, we do not find that the remark rose to the level of plain error. It is one isolated instance of a tangential remark made by the prosecutor regarding hearsay evidence of Tracey's state of mind. Accordingly, we are not convinced that the remark which Stephens now assigns as error affected the outcome of the case. It did not rise to the level of plain error, and it did not constitute prosecutorial misconduct.
Stephens' second assignment of error is overruled.
 III. The trial court wrongfully allowed certain very prejudicial hearsay evidence to be introduced in court thereby violating Defendant's right to due process.
Over defense counsel's objection, the trial court allowed Mary Anderson to repeat Tracey's statement that "My old man done it" in reference to the bruises on her face. Stephens argues that this statement did not fall into a category for hearsay exceptions, and that, at a minimum, a cautionary instruction should have been given.
We note that the trial court has broad discretion in determining whether relevant evidence should be admitted or excluded. State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus. We will not overturn a trial court's ruling absent a showing of an abuse of discretion. State v. Martin
(1985), 19 Ohio St.3d 122, 129. Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is generally inadmissible, unless the evidence falls within one of the recognized exceptions. Evid.R. 802. "The admission into evidence of a hearsay statement pursuant to a firmly rooted hearsay exception does not violate a defendant's right of confrontation."State v. Dever (1992), 64 Ohio St.3d 401, paragraph three of the syllabus, following White v. Illinois (1992), 502 U.S. 346.
One such exception is the "excited utterance," which Evid.R. 803(2) defines as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The following conditions are necessary for a trial court to determine whether statements are admissible as excited utterances:
 (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective, (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination continued (emphasis sic) to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.
State v. Stapleton (June 22, 1994), Montgomery App. No. 13579, unreported, quoting Potter v. Baker (1955), 162 Ohio St. 488, paragraph two of the syllabus, 55 O. O. 389, paragraph two of the syllabus.
Applying the above criteria to the instant case, we find that the trial court properly admitted the statement under the excited utterance exception. Tracey was kidnapped, beaten and raped. She escaped from Stephens and made the statement to a neighbor almost immediately upon seeing her. The experience she had just endured was startling enough to still her capacities for reflective thought and rendered her statement spontaneous and sincere. Tracey's statement was made to Anderson almost immediately after she appeared on her doorstep, thus before the nervous excitement of the preceding events had been lost. Moreover, Tracey's statement related to the preceding events and it was clear that Tracey had an opportunity to personally observe who had beaten her.
Furthermore, the fact that time had elapsed between the beating and the point where Tracey appeared at Anderson's door did not preclude Tracey's statement from falling into the excited utterance category. As the Franklin County Court of Appeals held in State v. Minturn (Dec. 20, 1994), Franklin App. No. 94APA04-532, unreported, we have to look beyond the temporal element of the statement and examine "whether the declarant was still under the stress of nervous excitement when the statements [were] made." Id., citing State v. Boston (1989), 46 Ohio St.3d 108,118. In Minturn, time had elapsed from when the defendant had raped, kidnapped and robbed the victim, to the time the victim drove to her friend's dorm room to tell her about what had happened. The court found that the friend's testimony concerning the victim's hysterical demeanor indicated that the victim was still in a state of emotional distress, and that the statements she made to her friend qualified as excited utterances. Id.
This case is similar to the situation in Minturn. Tracey took the first opportunity she could to get away from Stephens after the rape and the kidnapping. When she appeared at Anderson's door, she was still in a state of emotional distress, having just "escaped" from Stephens and found refuge and help in Anderson. Given the shock of the morning's events, we find that Tracey's condition at the time she reached Anderson's trailer qualified her statement as an excited utterance, as the statement was a product of spontaneous thought, rather than reflective thought.
Accordingly, the trial court's admission of the statement did not constitute an abuse of discretion, and it did not materially prejudice Stephens. We hereby overrule Stephens' third assignment of error.
 IV., Defendant was denied his constitutional and statutory rights to be present during all stages of the trial.
Stephens argues that defense counsel's waiver of Stephens' presence during the in-chamber conference between a juror, Gary Ries, and the trial court regarding Ries' ability to be fair and impartial was a violation of his constitutional and statutory rights. Stephens contends that while Ries was excused and replaced with an alternate juror, he did not have an opportunity to inquire whether or not Ries had "tainted" the rest of the jury pool prior to his having been excused.
In arguing this assigned error, Stephens relies heavily onState v. Williams (1983), 6 Ohio St.3d 281. In Williams, the Ohio Supreme Court held that "[t]he failure of the trial court to ensure a criminal defendant's presence at an in camera voir dire
proceeding to determine a juror's fairness and impartiality is error." Id. at paragraph two of the syllabus. Although we agree with Stephens that the court in Williams found such activity to be improper, it is important to note that the court did not find such error to be significant and one which required a reversal. The court found the act to be a "harmless violation of Crim.R. 43(A)," and held that it was not prejudicial because Williams' due process rights had not been affected. Id. at 286. The court stated:
 For several reasons, appellant's "due process" rights were not appreciably impaired by his absence at the voir dire
proceedings. First, his interests were more than adequately represented by his attorney who was present at the voir dire. Several federal circuit courts of appeals have recently faced analogous "due process" problems. The appellate court in Henderson v. Lane (C.A.7, 1980), 613 F.2d 175, 179, rejecting defendant therein's claim that the failure to secure his attendance at a proceeding to reinstate an alternate juror was reversible error, found his attorney's presence at the proceeding to be "[t]he most obvious barrier to prejudice in * * * [the] case." Similarly, the review court in United States v. Brown [(C.A.6, 1978), 571 F.2d 980,] 987, ruled that defense counsel's active participation in an in-chamber conference regarding the dismissal of a juror negated any prejudicial impact that might have resulted from defendant's absence during the discussion.
 Moreover, appellant's attendance at the voir dire would have contributed little to his defense. Appellant did not personally observe the improper communication, and his own conduct was not at issue in the proceeding. Finally, appellant's failure timely to object to his absence constituted a waiver of his right to be present, relieving this court of any duty to consider the issue. That the privilege waived had constitutional implications is of no significance as such rights too, if not properly exercised, may lapse.
Id. at 286-287. (Citations omitted.)
Furthermore, this court has found that waiver does apply to Crim.R. 43(A):
 Counsel is presumed to be authorized to act for his or her client. Therefore, an express waiver by counsel is sufficient to waive the right because the client's voluntary choice is implicit in and demonstrated by the wavier given by counsel. This express waiver exception also applies to Crim.R. 43(A).
State v. Carr (1995), 104 Ohio App.3d 699, 703. See, also, Statev. Roe (1989), 41 Ohio St.3d 18, 27, citing United States v.Gagnon (1985), 470 U.S. 522.
In this case, defense counsel waived Stephens' presence during this conversation. In fact, the parties had agreed to let the trial court exercise its discretion in deciding what should be done with Ries. After Ries admitted that he would feel more comfortable by being excused from his responsibility, the trial court did so. Furthermore, as the State pointed out, Stephens' concerns that the jury was tainted by Ries' experiences and relationships with police officers were proven to be unfounded when the jury acquitted Stephens of the charge of felonious assault on a peace officer.
Based upon our preceding discussion, we find that Stephens was not prejudiced by his absence from the voir dire of Ries, after his counsel lawfully waived his right to be present. Accordingly, Stephens' fourth assignment of error is overruled.
 V. The trial court committed prejudicial of error {sic} by depriving Appellant due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution and comparable provisions of the Ohio Constitution by entering a verdict of guilty as such a verdict was against the manifest weight of the evidence.
In considering Stephens' assignment of error, we first note that in weight of the evidence challenges, an appellate court:
 [R]eview[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Statev. Martin (1983), 20 Ohio App.3d 172, 175. While Thompkins
explicitly permits this court to consider credibility when confronted with an argument that the verdict is against the manifest weight of the evidence, such consideration is not unbounded. We have explained the limited role of an appellate court in reviewing issues of credibility in weight of the evidence challenges as follows:
 Because the factfinder, be it the jury or * * * the trial judge, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witnesses. Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion. Therefore, although this distinction is not set forth in Thompkins, supra, we conclude that a decision by a factfinder as to which testimony to credit, and to what extent, is a decision that is entitled to greater deference than the decision as to how much logical force to assign an inference suggested by that evidence — in short, how persuasive it is.
State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288, unreported. Mindful of these principles, we turn to the merits of Stephens' last assignment of error.
Stephens' whole argument rests on the issue of credibility. Stephens argues that his convictions were against the manifest weight of the evidence because the jury based its determination solely upon Tracey's account of the events. He argues that the not guilty verdict on the felonious assault charges indicated that the jury "lost its way" and that Tracey was not credible. We do not agree.
Tracey and Stephens presented two separate and distinct stories of what occurred the morning of February 18, 1999. The verdict reflects the jury's decision to credit Tracey's testimony to a greater degree than it did Stephens'. As we stated inLawson, supra, this decision was within the peculiar competence of the jury because they had seen and heard both witnesses, and the determination in that regard is entitled to substantial deference by this court. See, also, State v. Sherrill (Jan. 28, 2000), Montgomery App. No. 17359, unreported.
As a final point, there is no support for Stephens' rationale that Tracey was incredible and unreliable simply because the jury did not convict him on the felonious assault charge based upon a portion of Tracey's testimony. The jury was capable of sorting through the testimony and determining what they felt was credible and what was not. "The jury is the sole judge of the weight of the evidence and the credibility of witnesses. It may believe or disbelieve any witness or accept part of what a witness says and reject the rest." State v. Antill (1964), 176 Ohio St. 61, 67, 26 O. O.2d 366, 369.
Accordingly, the verdict is not against the manifest weight of the evidence, and we overrule Stephens' final assignment of error.
The trial court's judgment will be affirmed.
BROGAN, J. and FAIN, J., concur.